as United States Secretary of State Mr. Tarras for the appellant Mr. Goldsmith for the appellate Mr. Tarras, let's wait until the courtroom is clear. Let's just wait until the courtroom is clear. Just hold on one minute until the courtroom is clear. Yes, of course. All right. Go ahead. Thank you. Excuse me. Good morning. I am Christopher Tarras, arguing this case today and with me is Mr. Mike Meyer, who is the lead counsel in this case. Now, since our case was filed in April 2013, we have had exactly no time whatsoever to present our case. So the ten minutes that we have here today, we are very appreciative, actually, and very grateful to have this opportunity. Now, in perfecting this appeal, the clerk asked a question, many questions, but one of the questions is, is this a complex case? No, it's not a complex case, but it is a very important case. A very, very, very important case because the underlying issue is will the rule of law triumph over arbitrary official action and will the right to be heard be preserved? Now, since the district court dismissed our case on the Department of State's motion to dismiss, we've been denied our day in court. We've been denied the right to challenge what we assert is deliberate, purposeful, and illegal government action. Now, the question here, is the State Department going to be allowed to violate with impunity congressional statutory immigration scheme statutes? Do aggrieved immigrant applicants have no remedy, no remedy, for illicit government action when a reasonable basis, at least a plausible basis, is articulated? The Department of State asserts in these proceedings, and has asserted since April 2013, our client has no right to present a case. We have no right whatsoever to be heard. The Department of State, according to their argument, can do whatever it wants, and we can say nothing about it. Now, the substantive issue here involves one date in the Department of State's publication called the Visa Bulletin. Now, in the briefing and in the record, we explain the importance of the Visa Bulletin, and we actually made this one of our hearing exhibits, Exhibit 1, because the court panel may not be familiar with this publication, so we provided the whole thing. We've tried to focus, be very focused on the small part of this Visa Bulletin that we're focusing on and arguing about in these proceedings, but we thought you might like to see the full seven pages of this publication, which comes out every month. And all we're talking about here, all we're talking about is one date. Third preference, employment-based, China, other workers is the name for it. One date on page three. The accusation that we've been met from the beginning and confront here today is that we're trying to change the entire visa allocation system. Nothing could be further from the truth. One date. Nothing more. Now, more specifically, we have submitted in our briefs and all along an analysis of Section 1153 of 8 U.S.C. 1153, B3 that is, has the statutory criteria for eligibility for so-called employment-based immigrant visa applicants. If you are a foreign national and you want an immigrant visa, you look and see if you can qualify for one of these five categories. The one we're talking about is B3, and it's commonly called third preference, and it has three subparts. It has skilled workers, professionals, and so-called other workers. And that statute provides the eligibility criteria. How do you qualify for it? There's also an allocation number, percentage. Normally, 140,000 employment-based visas Congress has set aside each year. That's the normal number. Of course, it changes for various reasons that are not at issue here, but that is the normal number, 140,000. Of that number, this third preference that we're talking about. Would anything happen to your case if it turned out there were actually other countries that had different E3 and EW cutoff dates? I'm sorry, I don't understand the exact question. A lot of your briefing was China's the only one that has this differentiation. If that weren't true, would that affect your legal argument? How would that affect your legal argument? I'm sorry, I don't quite understand the question. If it weren't true, if it wasn't just China, if, for example, India had had a differentiation in these cutoff dates in the past, what would happen? I'm just trying to figure out. You stress it a lot in your briefs, and I'm trying to figure out how important that is. Okay. Your Honor refers to the substantive date, and we do not stand here today and argue about and contend that the substantive dates are wrong. No, no, no, I'm not talking about substantive dates. I understood your position to be that you were challenging their practice of having one cutoff date for the other workers and a different cutoff date for the skilled and professional workers, all of whom are under the EB3 category. Is that correct? For China, that's correct. For China. We're talking about China because our client's from China. Yes, and that part of your argument was that this only happens to China. It only happens to China. Okay, and if that weren't true, if it actually happened to other countries, what then? Well, if the State Department has a legal justification and a factual justification for doing so, then they can do so. We submit they have no legal justification for doing so. They have no factual justification for doing so. And if the State Department disagrees with our analysis of the statute, then, as Your Honor points out, why is it that the other 200 countries in the entire world enjoy parity among the three categories? India's had different cutoff dates for other workers and the professional and skilled workers. It's had the same differentiation you complain about in the past. It may have had that in the past, and it may have been justified. We have to talk about a specific time and date. Today, it's not. India enjoys the same cutoff date. Your position has to be exactly the same at all times? I'm just trying to understand what – because this seems like a very complicated scheme, and so I'm trying to understand how – what your basis for arguing that they are locked into a single, uniform cutoff date for EB-3 applicants is. No, that's not our argument. Our argument is if you look at the statute, B-3, Part A – there's Part A and Part B – Part A has three different eligibility criteria, skilled workers, professionals, and other workers. There's – and overall for that category, it allows 28.6 percent of the visas for that category. Okay. There's no difference between those three eligibility categories in what's the share. In theory, other workers could get 100 percent. Professionals could get 100 percent. Skilled workers could get 100 percent, in theory. Congress has not differentiated between those three categories. So – and maybe – hopefully it's understood here that the cutoff date is very important because the farther back that the cutoff date is set – I think we understand how it works in that regard. I'm just trying – you just said in theory it could be that all the visas would go to skilled workers. That's correct. In theory, as in the State Department could do that? In theory, the State Department could do that. It could give – if – it depends on the priority date and the cutoff date. So if in a particular time the only people in line are skilled workers, then they would get the whole share. They'd get the whole share. Now, in practice, that's not going to happen because if you have a given priority date, whatever it is, you're going to have a share. You're going to have a certain share that goes to skilled workers, a certain share that goes to professional workers, and a certain group that qualify under the other workers. So – Is your concern here that the numbers are different or just that they haven't explained why the numbers are different? I'm sorry, the cutoff dates are different or that they haven't explained why the cutoff dates are different? Both. Both. Both. So even if they gave an explanation, you would say, I don't care what your explanation is, as a matter of law, they have to have the same cutoff dates? No. They haven't given any explanation at all. We just said both, so that's what I'm trying to understand. Our position is they can't explain it because they're not following the law. They're not. Okay, so there is no – the statute mandates a uniform cutoff date within the EB-3 categories. Yes, unless there's one possible exception. We all deal with exceptions in law, which is Part B, Capital B. 11-5-3, B-3, Capital A and Capital B, it says for other workers there's a worldwide cap. The statute says $10,000, but we can agree it's actually $5,000. Temporarily has been for a few years, maybe two or three more years, it's still going to be $5,000. But that cap applies to the entire world. Now, isn't the essence of what has injured your client the fact that that allotment, let's say $5,000, that allotment is distributed by the State Department between all the countries on one basis, not based on the number of applicants in that category? And the result is that China has a very large number of applicants in that category and a relatively small share under the State Department's formula means that it can't use a proportionate share of the $5,000. Is that correct? No, that's not correct. As I understand, Your Honor, that's not correct. We have material in the record saying that the State Department has allocated 319 of these slots to China, notwithstanding that there are many more people in China applying in this category than in countries that are given an allotment which they don't fully use. Well, the 319 would be fiscal year 2013, I believe. 2014, it's 146. But the State Department doesn't start out saying, okay, let's see. We're going to pick a certain number that China gets or a certain number that Ireland gets or Sri Lanka gets. You start with, in third preference, a share, which is 28.6%, which is $40,400 for everybody in the world. And then they determine, okay, do we have enough visas available to satisfy the demand? Now, in the case of just two countries now, which is China and India, there's not enough demand or not enough slots. There's plenty of demand but not enough slots. They're the biggest countries in the world, greatest population. So they have to set a cutoff date. That we have no problem with. We understand that. We don't object to that. What we object to is that in the case of China, which is the only country in the world which has done this way, the State Department has come up with a cutoff date that's different than the skilled and professional workers cutoff date for this third preference. And there's no basis for that. What I understand is, at least in part, consequence of the mental operation described in paragraph 14 of the Oppenheim Declaration, in which the China EW limit is reduced to 12.5% of the overall China EB3 limit. And that takes it to 319. That's… Is that accurate? It's not an accurate reflection. It may be immaterial because the district court had its theory for not looking at any of this. Well, it's not an accurate picture of how it works. In other words, Congress, again, has given us the statute, B3A. And it doesn't say, okay, among those three categories, there's a certain percentage that we allocate to other workers, skilled workers, and professionals. No. It says that of all the 140,000 for the whole world, you get 28.6%. And then, if there's an oversubscription, means there's excess demand, which you have in China and India, then the State Department's got to figure out, okay, where do we set our cutoff date so that the demand doesn't exceed the supply? Can I ask you, because your time has run out here, I just wanted to ask you a question on your national origin discrimination argument. And I'm curious as to what you think 1152A1B, how that applies to your national origin discrimination argument. That… Which says nothing in… So A is the bar on national origin discrimination. B says nothing in this paragraph shall be construed to limit the authority of the Secretary of State to determine the procedures for processing of immigrant visa applications. Or the locations where such things are processed. With respect to locations, we've already held this is a full commitment to agency discretion. So I'm wondering why B doesn't bar your national origin discrimination claim. I'm sorry, I don't quite… Do you have the statute in front of you? 1152, I don't have it in front of me. I'm going to do A, you write capital B, it's attached to the red brief. I didn't find it. Okay. Never mind then. Never mind. It's okay. It's all right. If we have it in the appendix, maybe we should save your answer for a promulgation. Save it for rebuttal, that's fine. Mr. Terrass, we'll give you a couple of minutes in reply because you're out of time already. We'll give you a couple of minutes in reply. Okay, thank you very much. Mr. Goldsmith now. I much appreciate it. Your Honor, may it please the Court, Aaron Goldsmith on behalf of the United States Department of State. This case has been something of a moving target, but the one constant has been plaintiff's contention that the State Department is required to use the same cutoff dates for skilled and unskilled other workers. Before we get into that, can you answer my question? Why did you brief below, because I didn't see it and I didn't see it in your brief here, 1152A1B with respect to the national origin discrimination argument? Right, Your Honor. The State Department is required to consider national origin in terms of the per-country limits set forward in 1152B. So that's the short answer, that it's not only is the State Department permitted to consider national origin, it is required by statute to determine the per-country, that's the 7% limit set forward by Congress. In terms of, that's why this case has always been about whether or not there was a requirement, in the words of the plaintiff, a clear non-discretionary duty, and this comes from paragraph 36 of the complaint, to use the same cutoff date for the category and subcategory. And that's plain, ordinary, garden variety, substantive legal argument, right? But your principal argument for us and for the district court is there's something about this case that makes it non-mediable under the APA. While it looks to me like an absolutely standard case, not regardless of the merits. Well, I think there are two points that the district court picked up on. One is that the statute does not require that the State Department use the same cutoff date for skills. That's a substantive proposition. You didn't win on that at all. I believe we did. I'm sorry, I interrupted you, Your Honor. I apologize. You won on the Southern Utah theory, right? Well, there were two bases for the district court's decision, as I rate it. And one is the Southern, the Norton decision, 706.1, you can only proceed on discrete agency action. This isn't a discrete agency action. And then the district court says something to the effect of, moreover, it doesn't look like the statute actually requires these two things. And that is a pure question of law. That's why the claim failed. Last paragraph. Last paragraph. Not much analysis, so pretty complicated. I concede there's not a lot of analysis on that point. It seems to be a throwaway line, right? I wouldn't agree that it's a throwaway line. I would agree that it is very limited analysis. I would concede that. So that's basically what we're left with. Did you fully brief the merits below as well as the Norton point to the district court? What did you mean? Did your briefing similarly throw out the point, or did you fully develop? Because this seems like very complicated stuff to my mind. There were two rounds of briefing in the district court, plus supplemental briefing, because while the case was before the district court, the cutoff dates for the category and subcategory merged. And I had some difficulty, and perhaps this is entirely my fault, in understanding what were the allegations actually being raised in the complaint. So we filed a motion to dismiss. They failed to state a claim. Here are the reasons. And then in the alternative, we filed a motion for summary judgment, submitted a sworn declaration, explaining how these numbers were arrived at, because I thought they were asserting a challenge under 706-2, that this was an arbitrary and capricious allocation of the visa numbers in 2013. But that's, as it turned out, not what they were alleging. And in any event, that issue is now moved. The issue that was before the court, that was framed by the parties after two rounds of briefing and the supplemental filings, were the simple question of, is there a requirement to use the same cutoff date for the category and the subcategory? And I would respectfully request this. So that's a standard substantive statutory argument. Yes, but it's a legal argument. You don't have to look at the facts. But that's a traditional APA argument. You would concede that. Yes, it's an APA argument. It's a statutory interpretation argument. It's a pure question of law. So why shouldn't the district court address it? I'm sorry? Why shouldn't the district court address it? Well, we believe that the district court did address it, although it's been denied. In the moreover paragraph? Yes. Sentence. That is correct. That there's no – that that analysis was correct. It was on point. There was no requirement by statute to use the two – the same cutoff dates for those two – the category and the subcategory. They're not challenging the process. They're not challenging methodology. They are challenging the process. They have said – And 1152, right? But in their opening brief, they repeatedly say, we're not challenging the process. There's these references to – I think which process is what gets very confused. When they say we're not challenging the process, they mean we're not challenging some global programmatic process, as opposed to you set these dates, that's a process, too. And we argue that those dates, as set, violated statutory text and hurt our client in the process. And as to that latter process argument, that I think you agree is a traditional APA argument. I would agree that the argument of whether or not they have to use the same cutoff date is a traditional APA. And that's a discrete action that can be challenged under APA. I don't agree that it's a discrete action. I think the district court got it correct in saying under the APA, you can only challenge discrete agency actions. And this is – What makes it a nondiscrete action? In other words, at some point, somebody in the State Department makes a decision about how to apply these various statutes and quotas and ceilings and so forth, and presumably looks at the statutes and reads them a particular way. And then the resulting numbers go out to the consular agents, I guess, in each country to work them out. So why isn't that just a discrete decision, I guess done monthly, which has certain consequences, adverse to machine? Because it's not like a challenge to a particular permit application petition. Yeah, we have an awful lot of things that aren't just a challenge to a single permit. That is correct. But you don't get this government benefit. Isn't that essentially what the Visa Bulletin says each month? You don't get this government benefit. At this time. Right. That's what it's – but it's not a decision on the actual visa application. The Security Administration says you don't get this benefit at this time. You don't think someone could challenge that under the APA? We would concede you could challenge – if an agency says your application for adjustment of status, if USCIS says your application for adjustment of status is denied, that is something that can generally be challenged under the APA. But this is – this seems to be more tied to the Visa Bulletins and the process by which they arrive at these estimates, these reasonable estimates contemplated by 1153G, as to what the demand is for these different categories. And we don't think that's a discrete agency action, and we don't think that the actual – the focus of the argument in the district court, the whole thrust of it, was on whether or not there was a requirement, a legal requirement to use the same cutoff dates. And I would add that on page 6 of the opening brief, plaintiff says that they – that she does not at this time challenge any particular dates DOS assigns to immigration categories in allocating immigrant visa numbers, only that the China dates assigned should, under the present circumstances, be identical for the subcategories. And that's part of the problem. There's no challenge here to any particular dates. There's no allegation that additional visa numbers should have been allocated to a particular category. It is – it is – The challenge is that you have come up with two different dates, and that violates a command of same dates under the statute. That's their argument, right or wrong. That's their argument. And that fails as a matter of law. You come up with different dates, statute requires same date. As to this particular subcategory, it's hard to think of anything more discrete than that. I would say that argument fails as a matter of law. It doesn't need to be remanded back to the district court because this court can simply look at the statute and determine on its face, is that required, is there a clear command that the promise dates are correct? It turns out there are a lot of steps in the process. And a lot of this case is very unclear to me. But one thing that is clear is that working through those steps is extremely complicated and has never been explained in any satisfactory way by plaintiff or defendant. And it's hard for me to see how the case can be resolved without that step-by-step process going forward. I see my time has expired. May I have a few seconds to respond? Yes. And you might add the district court to that as well. Your Honor, we sought to respond to the arguments as they were raised and try to explain things to the best of our ability. I mean, that's absolutely crazy. At page 6 of your brief, you have this remarkable statement. On appeals, she's not challenging particular cutoff dates. That's right. We're claiming the cutoff dates were established in a discriminatory manner. She is claiming they were established in a manner that discriminates in violation of the statute. And she relies very heavily on 1153E, which is nowhere recited throughout her brief and nowhere in your brief. Your Honor. I mean, you arrive at your conclusion just by ignoring the claims made. Well, Your Honor, to the extent there is any deficiencies with the brief, and I take full responsibility and apologize to the Court, I sought to understand what they were – it was a little bit unclear as to what the claims were actually being raised. But the thrust of it seemed to be this argument that there had to be the same cutoff dates, and that was a requirement by statute, and that's not what the statute says. And for that reason, it's a question of law in this Court, ma'am. Can I ask a quick question? On 1153E3, it says, waiting lists of applications, applicants for visas, shall be maintained in accordance with regulations prescribed by the Secretary of State. Are there any such regulations? Your Honor, I don't have the answer to that question. I don't believe so, but I don't have the answer. Are there any regulations anywhere that explain any of this process, or is it just the opposite? There are some regulations. That explain this process, how the dates are set or how the waiting lists are maintained or how the reasonable estimates are made? That's not how the estimates are made. Okay. Or the waiting lists, as far as you know. As far as I know, no. Okay. Thank you, Your Honor. Thanks. All right. Does Mr. Terras have any time? All right, why don't you take two minutes? Yes, thank you very much. Perhaps I can address the China discrimination claim for just a moment. Our basic claim is this, that out of all the countries in the world, only China has been singled out for the disparate treatment in terms of the cutoff date disparity between skilled workers, professional workers, and other workers. The only reason that our client, Ms. Xi, is suffering the way she's suffering over in China right now, waiting for this process, is because she was born in China. The State Department has singled out China. So under the circumstances of this case, if you're born in China, you get put into this extra suffering, shall we say. But that's the basic argument we have on discrimination. Now, if we can also address for just a moment, which is all we have, the process is indeed complicated overall. And Mr. Oppenheim that Judge Williams has referred to is the best expert in the world. There's no better expert than him. However, all we're talking about again is this one date and why is it different. And we say that that explanation is not all that difficult. But no matter whether it's difficult, complicated, or not, what we really want here is our day in court. Let us go back to the district court and work through it. You said Ms. Xi's been waiting a long time, which raised a question in my mind. This all depends on an employer certifying that they have a need for this particular employee and can't meet that need by using U.S. workers. That's correct. Eight years have now gone by since that certification was made. Is there an employer that's really been waiting eight years for just her? Or is there any update on whether there is still even a basis on which she could get a visa? Practically speaking, I know she's got her number, but practically speaking, eight years goes by. I can't imagine the employer still hasn't filled the spot in the interim. Well, yes. The employer is still willing to sponsor Ms. Xi. That's a valid question. And at the end of the process, we have to prove to the State Department, it's a reasonable requirement, that the employer still needs this person. But this employer happens to answer your question, Your Honor. This employer is located in a relatively rural North Carolina area, and it's hard to find Americans willing to do this work, which is working in a chicken processing factory. And they have an ongoing need and ongoing openings that persist year after year after year after year. Although this particular case actually might have misspoken. There's another plan in rural Ohio, but anyway, it's a rural area in the United States, and they have an ongoing need. It's just hard to find Americans to do this work, which is not considered high status or pleasant. So they do have ongoing openings. Thank you. All we ask for, again, please give us our day in court and let us work through this before the district court. Thank you.
judges: Henderson, Millett, Williams